IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HAYLEY S. STUMP, | ) | CASE NO. 3:18-cv-01819 |
| | ) | |
| Plaintiff, | ) | JUDGE JACK ZOUHARY |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Hayley S. Stump ("Plaintiff" or "Stump") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons explained herein, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

Stump protectively filed[1] an application for DIB on July 24, 2015, alleging a disability onset date of January 1, 2007.[2]  Tr. 12, 56, 57, 148-154.  Stump alleged disability due to Crohn's

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 7/1/2019).

[2] Stump had filed a prior application with a decision on that application being issued on August 14, 2008.  Tr. 12, 58. Since Stump's July 2015 application was filed beyond the four-year period allowed for reopening a claim for

1

disease and depression.  Tr. 57, 77, 199.   After initial denial by the state agency (Tr. 72-75) and

denial upon reconsideration (Tr. 77-79), Stump requested a hearing (Tr. 84-85).  A hearing was

held before an Administrative Law Judge ("ALJ") on August 1, 2017.  Tr. 30-55.

     In his November 17, 2017, decision (Tr. 9-29), the ALJ determined that Stump had not

been under a disability from August 15, 2008, through the date of the decision (Tr. 13, 23-24).

Stump requested review of the ALJ's decision by the Appeals Council.  Tr. 144-147.  On June 9,

2018, the Appeals Council denied Stump's request for review, making the ALJ's decision the

final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.    Personal, educational, and vocational evidence

     Stump was born in 1973.  Tr. 34, 148.  At the time of the hearing, Stump was living with

her two daughters, ages 13 and 17.  Tr. 34.  Stump has four years of college education.  Tr. 34.

Stump's past work includes working at a retail carpet sales store answering phones and assisting

customers with picking out flooring products.  Tr. 35.  At the time of the hearing, Stump was

working part-time at Jo-Ann Stores Incorporated ("Jo-Ann's") as a cashier.  Tr. 35.

### B.    Medical evidence

#### 1.  Treatment history

*Physical impairments*

     Stump has a history of Crohn's disease, having been diagnosed in 1998.  Tr. 828.  Stump

had her first Crohn's related surgeries in 2007.  Tr. 828.  During a medical visit at Women's

Health for Life (Tr. 279) in October 2009, Stump complained of urinary frequency with no

---

good cause, the period under consideration with respect to Stump's July 2015 application started on August 15, 2008, the day after the last decision was issued. Tr. 12.

abdominal pain and no limitation on her activities (Tr. 287).  In August 2011, Stump saw Dr.
Ven Kottapalli, M.D., C.N.S.P, of GI Physicians, Inc., after moving back to Lima, Ohio to
establish care.  Tr. 828-831.  Dr. Kottapalli noted that, since Stump's 2007 surgery she had been
doing well, other than one "flare-up of Crohn's" in June 2011.  Tr. 828.  With the flare-up in
June 2011, Stump was having abdominal pain.  Tr. 828.  She denied diarrhea, nausea, or
vomiting.  Tr. 828.  Stump reported that her abdominal pain was much better and she was doing
well.  Tr. 828, 830.  Stump was not interested in undergoing any treatment at the time.  Tr. 830.
She wanted to watch her condition – she did not like the side effects of some of the medications
she had been given in the past.  Tr. 830.  Dr. Kottapalli recommended that Stump have her
vitamin B12 levels checked and, if her levels were low, he would consider monthly vitamin B12
shots.  Tr. 830.

In September 2012, Stump was seen at the emergency room with complaints of
abdominal pain, nausea, vomiting and diarrhea.[3]  Tr. 582-588.  She was admitted by her treating
physician Dr. Oluremi Ojo, M.D.,[4] to the emergency room due to suspected flare up of Crohn's
and a possible bowel obstruction Tr. 582-588.

Stump was seen again at the emergency room on October 9, 2012 with complaints of
diffuse abdominal pain, vomiting and diarrhea.  Tr. 544.  She denied any urinary symptoms or
fever.  Tr. 544.  Stump relayed her history of Crohn's and indicated she was being treated by Dr.
Kottapalli and taking Humira.  Tr. 544.  A CT of the abdomen and pelvis was performed, which

---

[3] Records also reflect that, on June 14, 2012, Stump presented to the emergency room with complaints of abdominal pain.  Tr. 367-370.  Stump was admitted for observation and further testing.  Tr. 369.  The records are not entirely clear as to the course of treatment recommended following the June 2012 emergency room visit.  Plaintiff cites these records as documenting a 2015 emergency room visit (Doc. 12, p. 3) but the cited records are from 2012.

[4] Dr. Kottapalli was consulted as well.  Tr. 585.

showed a small bowel obstruction with findings of active Crohn's disease.  Tr. 546.  Upon

consultation with Dr. Ojo and Dr. Kottapalli, Stump was admitted upon Dr. Ojo's orders.  Tr.

546.  Following a surgical consult, surgery (exploratory laparotomy, adhesiolysis, and partial

bowel resection) was performed on October 11, 2012.  Tr. 550, 557-559.  Stump was discharged

home in stable condition on October 19, 2012.  Tr. 578-582.

On November 8, 2012, Stump saw Dr. Ojo for follow up after her hospital admission and

surgery.  Tr. 782-784.  Dr. Ojo noted that Stump's condition had improved.  Tr. 782.  Dr. Ojo

ordered lab work, prescribed vitamin B12 and recommended that Stump follow up in three

months.  Tr. 784.

Stump saw Dr. Kottapalli on January 23, 2013, for re-evaluation of her Crohn's.  Tr. 826.

Stump was having recurrent UTI since starting on Humira.  Tr. 826.  Stump reported that, three

to four days before taking her Humira, she started to have urgency and diarrhea – up until that

time she was having two bowel movements per day.  Tr. 826.  Dr. Kottapalli recommended that

Stump continue with vitamin B12 injections and Humira.  Tr. 827.  He also recommended a

kidney ultrasound due to the increased urinary frequency.  Tr. 827.

Stump saw Dr. Ojo for a follow-up visit on August 19, 2013.  Tr. 776.  Stump reported

abdominal pain but Dr. Ojo noted that Stump's symptoms were improved with Humira.  Tr. 776.

Dr. Ojo provided a prescription for Percocet and noted that Stump was scheduled to see Dr.

Kottapalli the following month.  Tr. 778.

During her follow-up visit with Dr. Kottapalli on September 9, 2013, Dr. Kottapalli

indicated that Stump had gained nine pounds over the prior six months.  Tr. 824.  She was

having two bowel movements per day; no constipation or diarrhea; no abdominal pain, nausea or

vomiting.  Tr. 824.  Stump was having lip sores and swelling on and off over the prior eight

months with her symptoms being worse over the last two months.  Tr. 825.  Dr. Kottapalli continued Stump on a low residual diet, vitamin B12 once per month, calcium with vitamin D, and Humira injections every two weeks.  Tr. 825.  He advised Stump to call his office if the sore on her lip opened.  Tr. 825.

Stump saw Dr. Kottapalli on February 12, 2014.  Tr. 822.  She had been taken off of Humira due to problems with her gums.  Tr. 822.  Stump reported having daily bowel movements and she denied diarrhea but, four days earlier, she was having on and off right-sided abdominal pain that was a contraction-type of pain that radiated all over.  Tr. 822.  Medication helped decrease the pain while certain foods increased her pain.  Tr. 822.  Dr. Kottapalli's assessment was Crohn's disease in remission with significant improvement in gingivitis after stopping Humira.  Tr. 823.  Dr. Kottapalli indicated that if Stump had a Crohn's flare up they would try a different medication.  Tr. 823.  He recommended follow up in one year.  Tr. 823.

Stump saw Dr. Ojo about a week later on February 20, 2014.  Tr. 773-775.  A review of systems was positive for diarrhea but negative for abdominal pain, nausea, or vomiting.  Tr. 773.  A review of systems was negative for anxiety, crying spells, depression, sadness and suicidal thoughts.  Tr. 773.  Dr. Ojo noted that Stump's Crohn's was in remission and Stump's quality of life since her diagnosis was much better.  Tr. 773.  Dr. Ojo recommended over-the-counter anti-diarrheal medication and continued Stump's prescription for vitamin B12 injections.  Tr. 775.

On February 21, 2015, Stump sought emergency room treatment, complaining of abdominal pain and diarrhea for a couple days.  Tr. 533.  She had also been vomiting but that had stopped.  Tr. 533-534.  Stump thought her symptoms might be a Crohn's flare-up.  Tr. 533.  Stump was discharged with prescriptions for Zofran and Prednisone and instructions to follow up with Dr. Kottapalli.  Tr. 535.

Stump saw Dr. Kottapalli on March 4, 2015. Tr. 819-820. Stump was no longer taking Prednisone, noting it was hard to work and focus while being on it. Tr. 820. Stump's nausea kicked in after work for which she would take Zofran. Tr. 820. She was also taking a probiotic and eating yogurt twice each day. Tr. 820. Dr. Kottapalli did not make any changes to Stump's treatment. Tr. 820.

On April 13, 2015, Stump saw Dr. Jean Paul Achkar, M.D., at the Cleveland Clinic regarding her Crohn's disease. Tr. 436-439. Treatment notes reflect Stump's history of Crohn's and past treatment for her condition. Tr. 436-439. Treatment notes also reflect that Stump was treated for C diff in March 2015. Tr. 439. Since Stump had not had a colonoscopy since 2007, Dr. Achkar recommended a colonoscopy for further evaluation of Stump's Crohn's as well as lab work. Tr. 439.

On May 22, 2015, Stump underwent a laparotomy and resection at the Cleveland Clinic due to recurrent Crohn's disease. Tr. 390-393. During a June 22, 2015, post-operative visit, Stump was gradually feeling better than before. Tr. 389. Following her surgery, she was having bowel movements 10-12 times per day as soon as she ate. Tr. 389. She had started to take a probiotic and her bowel movements were down to 5 times per day. Tr. 389. She did not feel that she could return to work. Tr. 389. Stump complained of weakness and some intermittent lower abdominal pain. Tr. 389. She was tolerating her diet and her appetite was improving. Tr. 389.

Dr. Achkar of the Cleveland Clinic authored a letter to Dr. Kottapalli on July 3, 2015, explaining Cleveland Clinic's recent evaluation of Stump's worsening Crohn's symptoms and her treatment, which included surgery in May 2015. Tr. 904-905. Dr. Achkar stated that "[g]iven that [Stump] has had 3 intestinal resections (2007, 2012, and 5/2015) and that she only has [approximately] 100 cm of remaining small bowel I recommended aggressive medical

6

therapy at this point." Tr. 904.  Dr. Achkar recommended either Cimzia or Entyvio plus

Methotrexate.  Tr. 905.  Since Stump lived a far distance from the Cleveland Clinic, Dr. Achkar

advised Dr. Kottapalli that Stump would be in touch with him about the medical management of

her Crohn's disease.  Tr. 905.

During a July 7, 2015, Cleveland Clinic telephonic follow-up visit, Stump was doing

better since her prior visit.  Tr. 383.  She was having occasional abdominal pain.  Tr. 383.  She

was getting stronger and her appetite was good.  Tr. 383-384.  She was having bowel movements

four to six times per day.  Tr. 384.  Stump was advised that she could slowly advance her diet,

start exercise (except no heavy lifting), and return to work, three days per week for the first two

weeks and then resume a normal schedule.  Tr. 384.

Stump saw Dr. Kottapalli on August 3, 2015, for follow-up visit.  Tr. 818-819.  Stump

was having two bowel movements per day.  Tr. 818.  Stump was following a gluten free, no

sugar diet.  Tr. 818.  Dr. Kottapalli noted Dr. Achkar's recommendation of Cimzia or Entyvio

with Methotrexate.  Tr. 818.  Dr. Kottapalli started Stump on Entyvio.  Tr. 819.

Stump saw Dr. Kottapalli again on September 3, 2015.  Tr. 817-818.  Stump had had her

first Entyvio infusion on August 31, 2015.  Tr. 817.  Since starting those treatments, Stump

reported having to wake up in the middle of the night to have a bowel movement.  Tr. 817.  She

reported 10-12 bowel movements per day.  Tr. 817.  Stump was not having abdominal pain.  Tr.

817.  Dr. Kottapalli ordered some testing of Stump's stools and continued her on Entyvio.  Tr.

818.  During a September 24, 2015, follow-up visit, Stump reported three bowel movements per

day.  Tr. 815.  Her bowel movements were semi-formed, she had no straining, and was not

looking for the bathroom – Entyvio was controlling her symptoms.  Tr. 815.

Stump saw Dr. Kottapalli on December 8, 2015.  Tr. 814-815.[5]  Stump was having about three bowel movements per day.  Tr. 814.  She was not having diarrhea, constipation, vomiting, or nausea.  Tr. 814.  Stump was concerned that the Entyvio was causing gingivitis.  Tr. 813.  Dr. Kottapalli continued Stump on Entyvio and recommended that Stump follow up with her dentist and have her dentist call his office.  Tr. 815.

Stump saw Dr. Kottapalli on February 8, 2016.  Tr. 861-862.  Stump reported having a flare up the prior week and she noted that she normally has a flare up around the time she starts her menstrual cycle.  Tr. 861.  Dr. Kottapalli assessed that Stump's Crohn's was in remission. Tr. 862.  He recommended that Stump continue on Entyvio, continue to follow a low residual diet, and take vitamin B12 daily.  Tr. 862.

On May 4, 2016, Stump was treated at the emergency room for abdominal pain.  Tr. 932-966.  Stump relayed that her pain had gotten worse over the prior few days with associated nausea, chills and diarrhea.  Tr. 933.  Stump reported that she had attempted to relieve her symptoms with Percocet and Zofran but it was not helping.  Tr. 933.  Stump was discharged in stable condition on May 6, 2016, with discharge diagnoses of partial small bowel obstruction, Crohn's disease, Crohn's stricture, and depression.  Tr. 940.

When Stump saw Dr. Kottapalli on July 16, 2016, for a follow-up Crohn's visit, Dr. Kottapalli noted that Stump was having three bowel movements per day – usually formed, no vomiting, and no nausea.  Tr. 859.  Dr. Kottapalli's assessment was Crohn's disease, unspecified, without complications, in remission.  Tr. 860.  Stump was receiving Entyvio every eight weeks. Tr. 860.  Dr. Kottapalli recommended a bone density scan.  Tr. 860.

---

[5] The records from December 8, 2015, are also located in the record at Tr. 862-864.

Stump saw Dr. Kottapalli on October 17, 2016.  Tr. 858-859.  Dr. Kottapalli noted that Stump's last Entyvio infusion was at the beginning of September.  Tr. 858.  She had a bone density scan performed on July 25, 2016, which showed Stump was at high risk for fracture.  Tr. 858.  Stump reported about three bowel movements per day, no abdominal pain, bowel-related issues, no nausea, and no vomiting.  Tr. 858.  Dr. Kottapalli's assessment was Crohn's – in remission and he recommended that Stump continue on Entyvio every eight weeks.  Tr. 859.

### *Mental health impairments*

Plaintiff sought treatment at various times for her mental health impairments.  During a July 9, 2009, well-woman examination, Stump's depression symptoms were discussed.  Tr. 280. Stump reported feeling good but she was tired on Celexa.  Tr. 280.  Stump's doctor recommended decreasing Stump's medication to see if that would help with Stump's tiredness. Tr. 283.

Later, during a well-woman examination in April 2012, Stump reported having a lot of depression and anxiety.  Tr. 303.  She relayed that her symptoms moderately limited her activities.  Tr. 303.  Her symptoms included anxiety, depressed mood, exhaustion, crying spells, hopelessness, helplessness, and loss of interest in activities.  Tr. 303.  Stump was started on Zoloft.  Tr. 306.

On July 25, 2012, Stump was seen for a medication follow-up visit for her depression. Tr. 314.  She reported side effects from Zoloft, including increased fatigue and increased appetite but less anxiety and depression symptoms.  Tr. 314.  Stump's medication was switched from Zoloft to Celexa.  Tr. 315.  Stump was seen again on August 22, 2012, for a medication follow-up visit.  Tr. 318.  She reported no side effects from the Celexa and she was less anxious and had less depression symptoms.  Tr. 318.  Stump continued on Celexa into 2013.  Tr. 323.  During an

April 4, 2014, medication follow-up visit, Stump requested that she be placed back on Zoloft for her depression. Tr. 329. During a May 13, 2014, visit, Stump reported that she was doing well on her medication. Tr. 333. Stump was continued on Zoloft. Tr. 336.

In June 2015, upon referral, Stump was seen for a Diagnostic Assessment/Intake Evaluation at SAFY due to reports by Stump that her boyfriend was molesting her daughters. Tr. 379. Stump reported being unable to sleep and was unable to stop thinking about what had happened to her daughters. Tr. 379. Stump was stressed and having difficulty concentrating, hypervigilance, and feeling jumpy/easily startled. Tr. 379. On physical examination, Stump was well groomed and dressed appropriately, she was cooperative, she had a full affect, she was sad and tearful, her speech was fluent, and her thought content was logical/oriented. Tr. 379. Stump reported being able to carry out independent living skills. Tr. 380. Stump indicated that she enjoyed crafts, helping people and going to church. Tr. 380. She had two good friends. Tr. 380. Stump was diagnosed with adjustment disorder with mixed anxiety and depressed mood. Tr. 381. She was assessed a GAF score of 51.[6] Tr. 381. Therapy was recommended to address symptoms related to depression and anxiety. Tr. 381. A therapy treatment plan meeting was conducted on July 7, 2015. Tr. 375-376.

During a December 17, 2015, routine follow-up visit with Dr. Ojo, Stump reported a moderate degree of depression with the following affective symptoms noted – insomnia, crying

---

[6] As set forth in the DSM-IV, GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

spells, decreased ability to concentrate, fatigue, sadness, and tendency towards indecisiveness. Tr. 1000.  Recent stressors included a divorce.  Tr. 1000.  Stump demonstrated an appropriate affect and demeanor, normal speech pattern, and grossly normal memory.  Tr. 1000.  Stump's Wellbutrin XL was refilled.  Tr. 1001.

During a March 21, 2016, follow-up with Dr. Ojo regarding her Crohn's and depression, Stump reported a moderate degree of depression with the following affective symptoms – crying spells, decreased ability to concentrate, and sadness.  Tr. 1003.  Stump was not suicidal.  Tr. 1004.  Dr. Ojo refilled Stump's Wellbutrin XL.  Tr. 1004.  In December 2016, Stump saw Dr. Ojo for a UTI.  Tr. 1017.  During that visit, Stump denied anxiety, depression or sleep disturbances.  Tr. 1017.  Stump continued to see Dr. Ojo throughout 2016 and 2017 for follow-up visits regarding her Crohn's and depression.  *See e.g.* Tr. 1007-1012, 1021-1024.  In April 2017, Stump started seeing Glen F. Strobel, Ph.D., for mental health treatment.[7]  Tr. 1101-1114.

### 2.  Treating physician opinion

On July 13, 2017, Dr. Ojo completed a Medical Source Statement.  Tr. 1030-1032.  In that statement, Dr. Ojo opined that Stump had the following lifting and carrying abilities - she could constantly lift and carry 1-5 pounds; frequently lift and carry 6-10 pounds; occasionally lift and carry 11-20 pounds; and rarely lift and carry 21-50 pounds.  Tr. 1030.  Dr. Ojo opined that Stump was limited to frequent handling with her right and left hands and frequent fingering with her right and left hands.  Tr. 1031.  Dr. Ojo opined that Stump could stand, walk or sit for a total of five and one-half hours each in an eight-hour workday and one hour at a time.  Tr. 1031.  Dr. Ojo opined that Stump could never climb ladders; she was limited to frequent climbing of steps; and occasional bending, crouching/squatting, and crawling.  Tr. 1031.  Dr. Ojo opined that

---

[7] The treatment notes are not very legible.

Stump's condition would likely deteriorate if placed under stress, particularly stress associated with a job.  Tr. 1032.  Dr. Ojo opined that Stump's condition existed and persisted with the restrictions as outlined in his statement since at least January 1, 2007, and opined that Stump would likely have five or more partial or full day unscheduled absences from work per month due to her diagnosed conditions, pain and/or medication side effects.  Tr. 1032.  Dr. Ojo indicated that his assessment was premised on Stump having Crohn's "which flares up frequently with <u>stress</u> despite adequate medication."  Tr. 1032 (emphasis in original).

**C.  Hearing testimony**

**1.  Plaintiff's testimony**

Stump testified and was represented at the hearing.  Tr.  33-47.

Stump discussed her Crohn's and explained that she tries to control it through diet and medication.  Tr. 40-41.  She also has had multiple surgeries.  Tr. 41.  Her current medication was Entyvio, which she had been on for almost two years.  Tr. 41.  She had been on Humira but towards the end of her treatment with Humira she had started to develop sores.  Tr. 41.  Stump was also starting to develop sores with being on Entyvio but she was told that there was no further treatment that she could try.  Tr. 41.  She was waiting to see what her gastrointestinal doctor advised.  Tr. 41.  Stump explained that she only had 4 feet left of her intestines so she would eventually need to have a bowel bag.  Tr. 41.

Stump is limited in what she can eat – she is mostly on a soft food diet.  Tr. 41.   Stress can cause a Crohn's flare up and there are foods that Stump avoids.  Tr. 42.  Stump generally drinks only water.  Tr. 42.  She is not supposed to drink anything with caffeine or high fructose corn syrup.  Tr. 42.  Stump's bowel movements are not what she would call "normal."  Tr. 44.  She has an urgent need to use the restroom.  Tr. 44-45.  At times, Stump has had to use Depends.

12

Tr. 45.  Also, when when Stump has a Crohn's flare up, she has pain – it is like a contraction and it feels like her intestines are in a knot.  Tr. 43.  To get the pain under control, Stump usually takes Percocet and Zofran.  Tr. 43-44.  The medication knocks her out and she does not eat anything for about 24 hours.  Tr. 44.  She will then start to gradually eat limited amounts of food and work back up to what she calls "normal" eating for her.  Tr. 44.  If the medication does not help get her pain under control, Stump then goes to the emergency room.  Tr. 44.

Stump discussed her part-time work at Jo-Ann's.  Tr. 35.  Stump works four days a week for five and one-half hours at a time.  Tr. 41.  She indicated that the job mostly involves standing and walking.  Tr. 38.  She explained that she was unable to work full-time because of her urgent need to use the bathroom and exhaustion.  Tr. 35.  Also, she explained that she had once tried to work part-time and go back to school but things got bad for her and she had to stop going to school.  Tr. 41-42.  Jo-Ann's makes some allowances for her while she is working.  Tr. 39.  For example, when she has to use the restroom, she gets on her headset to let co-workers know and someone will come take over her duties so she can use the restroom.  Tr. 39.  Also, there are some days when she does not feel well so Jo-Ann's will give her the time off.  Tr. 39, 44.  It might take her one to three days to feel better.  Tr. 39-40.  She has come very close to having an accident while at work and, once or twice, she has had to go home from work to get a change of clothes.  Tr. 40.  While at work, Stump uses the restroom between two and four times, depending on the day.  Tr. 40.

Stump's first stomach surgery was in 2007.  Tr. 39.  When her first surgery was performed, it had to be redone.  Tr. 39.  Since that surgery, Stump had two additional surgeries.  Tr. 39.

Stump can stand for five and one-half hours at a time.  Tr. 35.  Stump can sit for five and one-half hours at time.  Tr. 36.  She estimated having to use the restroom every two and one-half hours.  Tr. 36.  Stump self-limits herself to lifting 10-12 pounds.  Tr. 36.  Stump sleeps about eight or nine hours at night and, after working, Stump naps for about an hour or two.  Tr. 36. Stump does not need any help with showering or bathing.  Tr. 36.  She is capable of cooking.  Tr. 37.  Stump's daughters help with a lot of things at home.  Tr. 37.  One daughter will mow the grass and another daughter will do the dishes and vacuum.  Tr. 37.  Stump's hobbies included doing crafts, crocheting, and sewing.  Tr. 37.  Stump has stopped going camping and canoeing. Tr. 37, 46.  Stump and her daughters attend church three times each week.  Tr. 38.   If Stump is able to use the restroom and move her bowels a couple times before attending church, she is usually fine during church and, if not, she knows where the restroom is at church and sits close to the restroom.  Tr. 46.

If Stump is traveling, she will not eat while she is in transit because she has to know where a bathroom is at all times.  Tr. 37-38, 47.  Stump explained that one time she was really sick and her mother came from Pennsylvania to get her and take her back to Pennsylvania with her.  Tr. 40.  The drive was five and one-half hours and Stump had to stop 11 times to use the restroom.  Tr. 40.

Stump's internal medicine doctor is Dr. Ojo.  Tr. 42-43.  Stump sees Dr. Ojo the most. Tr. 42.  Dr. Ojo has noted Stump's depression.  Tr. 42.  Stump explained that part of her depression was due to life experiences.  Tr. 42-43.  She also explained that, because of her Crohn's disease, her body does not absorb vitamins like normal people and she does not absorb all her medicines.  Tr. 43.  Thus, her body is not getting the benefit of vitamins, such as vitamin B, which can help with mood, etc.  Tr. 43.  Stump has crying spells.  Tr. 43.  Physically, Stump

14

can work five and one-half hours and some days she has worked longer.  Tr. 43.  She explained

that, "emotionally, it's an ongoing battle."  Tr. 43.  Stump usually takes an hour and a half or two

hour nap each day and sometimes longer if she has the day off.  Tr. 43.

### 2.  Vocational expert's testimony

Vocational expert ("VE") Mary Everts testified at the hearing.  Tr. 47-53, 255.  The VE

reviewed information regarding Stump's past employment, which included work as a cashier,

kitchen helper and a salesperson in a floor covering environment.  Tr. 47-48, 269, 270.  The ALJ

informed the VE that the only work that the ALJ counted as past relevant work was the

salesperson, floor covering.  Tr. 48.

For his first hypothetical, the ALJ asked the VE to assume an individual of Stump's age,

education and work experience who has the RFC to perform work at the light exertional level

with occasional climbing of ladders, ropes or scaffolds; frequent climbing of ramps and stairs;

frequent balancing, stooping, kneeling, crouching, and crawling; frequent use of the bilateral

lower extremities for operation of foot controls; frequent use of bilateral upper extremities for

reaching, handling and fingering; avoidance of moderate exposure to hazards, such as dangerous

moving machinery and unprotected heights; and limited to simple, routine, and repetitive tasks

and a work environment free from fast-paced production requirements, such as moving assembly

lines and conveyor belts, involving only work-related decisions with few, if any, workplace

changes.  Tr. 48-49.  The VE indicated that the described individual would be unable to perform

Stump's past work as a salesperson, floor covering, noting that the past work was semiskilled

and would not fall within the hypothetical.  Tr. 48.  The VE indicated that there would be other

work in the national economy that the hypothetical individual could perform, including general

office clerk, information clerk, and sorter.  Tr. 49.  The VE provided national job incidence data for the identified jobs.  Tr. 49.

For his second hypothetical, the ALJ asked the VE to consider the first hypothetical except at a sedentary rather than light exertional level.  Tr. 50.  Considering the second hypothetical, the VE indicated that there would be jobs available in the national economy, including information clerk, unskilled inspector, and assembler (at a reduced number to eliminate the fast-paced production quota jobs).  Tr. 50.  The VE provided job incidence data for the identified jobs.  Tr. 50.

For his third hypothetical, the ALJ asked the VE to consider an individual who had the RFC to perform light exertional work with no climbing of ladders, ropes, or scaffolds; frequent climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching and crawling; frequent use of the bilateral lower extremities for operation of foot controls; frequent use of the bilateral upper extremities for reaching, handling and fingering; avoidance of moderate exposure to hazards, such as dangerous moving machinery and unprotected heights; limited to simple, routine and repetitive tasks in a work environment free from fast-paced production requirements, such as moving assembly lines and conveyor belts involving only work-related decisions, with few if any workplace changes; and will consistently be absent more than five days per month.  Tr. 50-51.  The VE indicated that there would be no jobs available in the national economy for the described individual.  Tr. 51.

With respect to employers' tolerance for being off task, the VE testified that, generally, if someone is off task 15% of the time on an ongoing basis, it would be work preclusive.  Tr. 51.  The VE testified that, generally, in addition to the standard two, 15-minute breaks, and a lunch period during an 8-hour shift, employers will allow someone to take two, very brief, bathroom

breaks.  Tr. 51.  After the 90-day probationary period, employers generally allow one unexcused absence per month.  Tr. 51-52.

Referring to statements provided by Stump's employer, Jo-Ann's, Stump's counsel asked the VE about missing approximately three days per month.  Tr. 52-53.  The VE indicated that that number of absences would typically not be accepted by employers.  Tr. 53.  The VE also indicated that providing coverage for an employee, allowing extra bathroom breaks, or allowing an employee to miss extra days would amount to an accommodation as opposed to a common practice.  Tr. 53.

### D. Third-party lay witness statements

#### 1. Kathryn Helser

Kathryn Helser, Stump's friend, submitted a statement, indicating she had known Stump since 2006.  Tr. 262.  Since having met Stump, Ms. Helser indicated she has gained a better understanding of Crohn's disease.  Tr. 262.  Ms. Helser relayed her observations regarding the effect Stump's Crohn's disease has had on Stump physically and emotionally.  Tr. 262.  Ms. Helser has helped Stump with transporting Stump's daughters when Stump has been unable to drive.  Tr. 262.

#### 2. Karen Huizinga

Karen Huizinga, Stump's friend, submitted a statement, indicating she had known Stump for approximately four years.  Tr. 263.  Ms. Huizinga stated that Crohn's disease had significantly influenced the quality of her friend's life, noting that the chronic condition caused diarrhea, extreme fatigue, excruciatingly painful stomach cramps, which have resulted in hospital admissions.  Tr. 263.  When Ms. Huizinga lived near Stump, she would pick up Stump's daughters about once a week because Stump was having a flare up or needed to rest to avoid

having a full-blown flare-up.  Tr. 263.  Ms. Huizinga described two instances where she witnessed the physical pain that a Crohn's flare up has had on Stump.  Tr. 263.  Ms. Huizinga also provided information regarding the emotional toll she feels Crohn's has had on Stump, noting that Stump had shared with her feeling embarrassed while at work when she has to leave a customer at the register due to the urgent need to use the restroom.  Tr. 263.

### 3. Holly Dyer/Megan Pasion

Holly Dyer and Megan Pasion, employees of Jo-Ann's, completed a statement, indicating that Stump had been employed at Jo-Ann's since 2011 and during her time with Jo-Ann's, Stump had two surgeries related to her Crohn's disease.  Tr. 264.  They explained that Stump has to take frequent bathroom breaks while at work and, to allow her to take those breaks, employees cover her duties until she is able to return to the sales floor.  Tr. 264.  The also explained that, due to Crohn's flare-ups, Stump occasionally is unable to work for up to three days at a time.  Tr. 264.

## III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[8] . . . .

---

[8] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his November 17, 2017, decision, the ALJ made the following findings:[9]

1.      Stump meets the insured status requirements through December 31, 2021. Tr. 14.

2.      Stump has not engaged in substantial gainful activity since august 15, 2008.  Tr. 14.  She worked after the alleged disability onset date but the work activity did not rise to the level of substantial gainful activity.  Tr. 14.

3.      Stump has the following severe impairments: irritable bowel syndrome/Crohn's disease/regional enteritis, status post-surgery; affective disorder; and anxiety disorder.  Tr. 15.  Stump also has the following non-severe impairments: osteopenia, vitamin B12 deficiency, hypertension, angular cheilitis, insomnia, and urinary frequency.  Tr. 15.

4.      Stump does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  Tr. 15-16.

5.      Stump has the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) except she has postural limitations of occasional climbing ladders, ropes or scaffolds; frequent climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; she can frequently use the bilateral lower extremities for operation of foot controls; she has manipulative limitations of frequent use of the bilateral upper extremities for reaching, handling, and fingering; she also has an environmental limitation to avoid moderate exposure to hazards, such as dangerous moving machinery and unprotected heights; she is limited to work that involves simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions, with few if any work place changes.  Tr. 16-22.

6.      Stump is unable to perform past relevant work.  Tr. 22.

7.      Stump was born in 1973 and was 33 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 22.

---

[9] The ALJ's findings are summarized.

8.      Stump has at least a high school education and is able to communicate in English.  Tr. 22

9.      Transferability of jobs skills is not material to the determination of disability.  Tr. 23.

10.     Considering Stump's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Stump can perform, including general office clerk, information clerk, and sorter. Tr. 23.

Based on the foregoing, the ALJ determined that Stump had not been under a disability, as defined in the Social Security Act, from August 15, 2008, through the date of the decision. Tr. 23-24.

## V. Plaintiff's Arguments

Stump argues that the ALJ did not properly account for all limitations associated with her Crohn's disease because the ALJ erred by partially discrediting the opinion of her treating physician Dr. Ojo and incorrectly discrediting third-party statements from friends and employers. Doc. 12, pp. 7-12; Doc. 14.

## VI.    Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

21

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.      The undersigned recommends that the Court AFFIRM the Commissioner's decision**

Stump argues that the ALJ erred by partially discrediting Dr. Ojo's opinion and by discrediting third party statements submitted by Stump's friends and employers.  Stump contends that the ALJ's errors in considering this evidence resulted in the ALJ not properly accounting for limitations associated with her Crohn's disease.

Dr. Ojo's opinion

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for the weight he assigns to the opinion.  *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011).  In deciding the

weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011). However, the "good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).

The ALJ explained the weight he assigned to Dr. Ojo's opinion, stating:

The claimant's primary care provider, Dr. Ojo, completed a medical source statement in July 2017. (Exhibit 14F). Dr. Ojo opined that the claimant could lift 11 to 20 pounds occasionally and six to 10 pounds frequently; frequently handle and finger bilaterally; sit, stand or walk for five and one-half hours each in an eight-hour workday, and 60 minutes at one time; use her feet for operation of foot controls; frequently climb steps; occasionally bend, crouch, squat, and crawl; and never climb ladders. (Id.). He further opined that the claimant's condition would deteriorate under stress and would have five or more days per month of partial or full day unscheduled absences due to her conditions. (Id.). He indicated that the claimant's Crohn's flared up frequently with stress. (Id.). This opinion is given partial weight. The portion of the opinion regarding the claimant's function-by-function limitations is given great weight because it is consistent with the medical evidence and, therefore, has been incorporated into the residual functional capacity. However, little weight is given to the opinion regarding absenteeism and frequent flare-ups because it is inconsistent with the medical evidence. As detailed above, the claimant had her first surgery in 2007, after which she reported doing well until mid-2012. Thereafter, she had a second surgery and was placed on Humira, which controlled the claimant's symptoms and caused the claimant's Crohn's to go into

remission.  (Exhibits 4F, 7F & 8F).  She continued to do well until spring 2015, at which time she had a third surgery.  (Id.).  Again, after surgery, she was treated with medication, entyvio at this time, which controlled her symptoms and once again put her Crohn's into remission.  (Exhibits 4F, 8F, 10F).  Notably, the record indicates only one emergency room visit for a Crohn's flare-up since the claimant's May 2015 surgery, indicating that the claimant's flare-ups do not occur with the frequency one would expect if the claimant would miss five or more days per month as opined to by Dr. Ojo.  Therefore, because that portion of Dr. Ojo's opinion is inconsistent with, and not supported by, the record, it is given little weight.

Tr. 20-21.

Stump challenges the ALJ's decision to assign only partial weight to Dr. Ojo's opinion regarding absenteeism and flare-ups.  She contends that her Crohn's disease is well documented throughout the record and that evidence supports Dr. Ojo's opinion that the ALJ assigned only partial weight to.  She argues that the third-party statements, which the ALJ assigned only little weight to, provide evidence of Stump's struggles with Crohn's and support Dr. Ojo's opinion regarding absenteeism due to Crohn's.  Stump also argues that the ALJ completely disregarded the connection between her Crohn's disease and mental health impairments.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all the relevant evidence" of record.  20 C.F.R. §§ 404.1545(a)(3), 404.1546(c).  Furthermore, the ALJ, not a physician, is responsible for assessing a claimant's RFC.  *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009).  When assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding . . . [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding."  *Id.*  Further, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  And, even if substantial

24

evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

While Stump contends that greater weight should have been provided to Dr. Ojo's opinion regarding absenteeism and flare-ups, she has not shown that the ALJ ignored evidence. Nor has she shown that the ALJ's reasons for assigning little weight to that portion of Dr. Ojo's opinion are unsupported by the record. Rather, Stump attempts to have this Court consider the evidence de novo and re-weigh Dr. Ojo's opinion. For example, recognizing that the record "may only contain a single emergency room visit after the 2015," Stump argues, "that does not mean that Ms. Stump's Crohn's disease does not significantly limit her ability to attend work or impact her ability to perform work-related functions." Doc. 12, pp. 9-10.

Here, consistent with the Regulations, the ALJ considered and weighed the evidence and Stump has not shown that the ALJ failed to satisfy the treating physician rule when weighing and explaining the weight assigned to Dr. Ojo's opinion. The ALJ weighed Dr. Ojo's opinion based on a thorough review of the evidence concerning Stump's Crohn's disease and other evidence of record, including evidence regarding Stump's mental health impairments. Tr. 17-20. The ALJ fully explained his reasons for assigning partial weight to the portion of Dr. Ojo's opinion regarding absenteeism and flare-ups. Additionally, as discussed more fully below, the ALJ considered and explained the weight he assigned to the third-party statements that Stump contends support Dr. Ojo's opinion regarding absenteeism and flare-ups.

For the reasons discussed herein, the undersigned recommends that the Court find that the ALJ did not err when weighing Dr. Ojo's opinion.

Third-party statements

SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006), explains that:

In considering evidence from "non-medical sources" who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors, it would be appropriate to consider such factors as the nature and extent of the relationship, whether this evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence.

2006 WL 2329939, * 6.

Consistent with SSR 06-03p, the ALJ considered and weighed statements submitted by third-party lay witnesses, explaining:

Multiple non-medical sources authored letters. The claimant's friends, Kathryn Hesler and Karen Huizinga, and her employers, Megan Pasion and Holly Dryer, each wrote letters to the file. (Exhibits 16E-18E). Ms. Hesler indicated she had been friends with the claimant since 2006 and had seen her through three surgeries, as well as multiple hospitalizations, though the last came more than a year prior to the writing of her letter. (Exhibit 16E). Ms. Huizinga reported she had known the claimant for four years, but had only observed two Crohn's flare-ups in that time. (Exhibit 17E). Her employers, Ms. Pasion and Ms. Dryer, noted that the claimant had had two surgeries during her employment, approximately three years apart. (Exhibit 18E). They also noted that the claimant often needed frequent bathroom breaks, though they did not specify how often these breaks were needed or how long they lasted. (Id.). They further reported that the claimant would occasionally have a Crohn's flare-up resulting in her not being able to go to work for one to three days. (Id.). Again, however, the frequency of these flare-ups and absenteeism is not indicated. (Id.). These statements are given little weight. The claimant's friends and employers are not medical professionals. As lay witnesses, they are not competent to make a diagnosis or argue the severity of the claimant's symptoms in relationship to her ability to work. The opinion of a layperson is far less persuasive on those same issues than are the opinions of medical professionals as relied on herein. Most important, the clinical or diagnostic medical evidence that is discussed more thoroughly above does not fully support their statements. Therefore, the undersigned finds the statements of the claimant's friends and employers are not credible to the extent their statements are inconsistent with the determination herein.

Tr. 21.

26

Stump argues that the ALJ provided a boilerplate rejection of the third-party statements and the mere fact that the lay witnesses are not medical professionals should not completely discredit their statements.  The ALJ's explanation is not boilerplate.  The ALJ considered and discussed each of the separate statements.  The ALJ explained the reasons for assigning the statements little weight.  Further, as is clear from the ALJ's detailed explanation of his consideration of the lay witness statements, the ALJ did not discredit the statements solely on the basis that the witnesses are not medical professionals.

Here, the ALJ did not ignore the lay witness evidence and Stump has not shown that the ALJ's evaluation of that evidence was contrary to SSR 06-03p.  Thus, while Stump disagrees with the ALJ's weighing of the evidence, she has not demonstrated that the ALJ's findings with respect to the lay witness statements are unsupported by substantial evidence.  *See e.g.*, *Kumar v. Colvin*, 2016 WL 2745863, * 6 (W.D. Ky May 11, 2016) (finding that the ALJ's findings were supported by substantial evidence where the ALJ adhered to SSR 06-03p when evaluating lay witness evidence).

For the reasons discussed herein, the undersigned recommends that the Court find that the ALJ did not err with respect to the lay witness statements.

## VII. Recommendation

For the reasons discussed herein, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

July 1, 2019                                     /s/ Kathleen B. Burke
                                                _____
                                                Kathleen B. Burke
                                                United States Magistrate Judge


## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).